**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**JUNE HARKNESS**                                                                    **PLAINTIFF**

**V.**                                                                    **NO. 3:13-CV-00129-DMB-SAA**

**BAUHAUS U.S.A., INC.**                                                                    **DEFENDANT**


## OPINION AND ORDER DENYING SUMMARY JUDGMENT

This is an age discrimination action brought by Plaintiff June Harkness against her former employer, Defendant Bauhaus U.S.A., Inc. Doc. #1. Plaintiff alleges that Defendant wrongfully terminated her employment in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq. *Id.* Before the Court is Defendant's motion for summary judgment. Doc. #43.

**I**
## Summary Judgment Standard

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship,* 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 22–23 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Norwegian Bulk Transp. A/S,* 520 F.3d at 411–12 (internal quotation marks omitted). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id.* at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998) (citation omitted). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.,* 639 F.3d 186, 191–92 (5th Cir. 2011) (citation and internal punctuation omitted). When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

## II
## Relevant Facts

Plaintiff is a white female who was born on August 1, 1941. Doc. #43-1 at Ex. 10. She is a high school graduate with approximately six months of college education. Doc. #49-1 at 8.

From 1961 to 2005, Plaintiff performed clerical work for three different furniture manufacturers: (1) Stratford, from 1961 until 1998; Benchcraft, from 1998 to 2003; and (3) Alan White Manufacturing Company, from 2003 to 2005. *Id.* at 10–12. At an unspecified time during her employment with Alan White, Plaintiff received a telephone call from Defendant "asking if [she] would like to have a job there." *Id.* at 12. Plaintiff accepted this offer and, on November

30, 2005, began employment with Defendant as a customer service representative.[1]  *Id*.  At that point, Plaintiff had never been disciplined by an employer.  *Id*. at 10–12.  Plaintiff was then sixty-four years old.

From 2005 until May 2009, Plaintiff worked in Defendant's Sales Service Department ("Department")[2] under its manager, Lynn McFerrin.  Doc. #49-1 at 13.  Generally, the representatives in the Department covered order entry, parts entry, credits for accounts, and customer warranties.  Doc. #49-2 at 8.  Plaintiff was never disciplined or written up during McFerrin's tenure as manager.  Doc. #49-6 at 13.

In May 2009, Kathy Jaggers assumed the role of manager of the Department.  Doc. #49-1 at 13.  During the time period relevant to this action, Jaggers reported directly to Britt Allred, Defendant's Vice President of Sales and Marketing; who, in turn, reported directly to Al Wiygul, Defendant's President.  *Id*. at 14.

During Plaintiff's employment, Defendant maintained a Standards of Conduct policy.  Doc. #43-1 at 15.  While Plaintiff never saw the policy itself,[3] she was "aware" of the information it included.  *Id*. at 16.

### A.  Jaggers' Treatment of Customer Service Representatives

At the time Jaggers took over the Department in May 2009, there were three customer service representatives: (1) Plaintiff; (2) Ellen Mink, who was born on or about 1940; and (3) Nancy Dobbins, who was born on or about 1953.  Doc. #49-15 at 5–6; Doc. #43-8 at ¶¶ 1, 4; Doc. #43-1 at 12; Doc. #49-5 at 6.  On February 8, 2010, Sabrina Hawkins Hupper, who was

---

[1] Plaintiff described the customer service position as "clerical" and testified that it was also known as an "inside sales position."  Doc. #43-1 at 12.

[2] This department is also referred to as "Customer Service."

[3] On November 30, 2005, Plaintiff completed an Orientation Checklist that "cover[ed] the Standards of Conduct."  Doc. #43-1 at Ex. 2.

born on or about 1986, was hired as a customer service representative.  Doc. #49-5 at 5.  Another customer service representative, Lisa White, whose age is unknown, worked in the office for a "few months" in 2010.  *Id.* at 6.

### 1.  Jaggers' Treatment of Dobbins

When Jaggers took over the Department, Dobbins was in her ninth year in her position.  Doc. #49-15 at 8.  In her nine years, Dobbins had been written up once – for an infraction in 2006.  *Id.*

Dobbins believes that Jaggers mistreated her by being too critical and refusing to help Dobbins or answer questions.  Doc. #49-15 at 7–8.  Dobbins testified that she does not believe she was mistreated because of her age.  *Id.* at 8.  Rather, Dobbins explained that the relationship between her and Jaggers "was more of a personal issue that probably happened long before she became our office manager and over our department."  *Id.*

On March 4, 2010, Jaggers issued Dobbins and Plaintiff a "Disciplinary Action, Verbal" for a "verbal confrontation."  Doc. #43-2 at Ex. 10.  Dobbins explained that this conflict was "over some parts orders and then that was straightened out."  Doc. #49-15 at 20.  The same day, Jaggers issued Dobbins a "Disciplinary Action Form" for a series of issues relating to "Attitude, Cooperation & Attendance."  Doc. #43-2 at Ex. 10.

On March 26, 2010, Jaggers issued Dobbins a "Disciplinary Action, Verbal Discussion" as a "Follow up to Written Disciplinary Action of March 4th, 2010."  Doc. #43-2 at Ex. 10.  On the form, Jaggers observed that "Nancy continues to make errors [and c]ontinues to delay responses to consumers …."  *Id.*

Jaggers terminated Dobbins' employment on March 30, 2010.  Doc. #49-15 at 5.  Jaggers explained that the termination was due to Dobbins' "excessive tardiness and costly errors."  Doc.

#43-2 at ¶ 21.  Following the termination, Jaggers first assigned Dobbin's territories to White, but then "assigned the majority of the territory for which [Dobbins] had been responsible to … Hupper, because … Hupper was the newest Customer Service Representative and had the fewest number of territories at the time." *Id*.; Doc. #49-5 at 6.

### 2.  Jaggers' Treatment of Plaintiff

Plaintiff testified that she believed Jaggers "was insecure and disliked it when [employees] would have more knowledge of entering a particular order," and that this insecurity "played a role" in how Jaggers treated her.  Doc. #49-1 at 57–58.

### a.  August 12, 2011, Write-up

Sometime in the summer of 2011, Plaintiff made a data entry error which resulted in Defendant sending an incomplete shipment to a client.  Doc. #43-2 at ¶ 3.  This error caused the customer to complain and "resulted in Bauhaus paying $359.45 in freight to ship the missing pieces …." *Id.*

In July 2011, Plaintiff "fail[ed] to notice an entry error [which] resulted in the production of twelve pieces of furniture."  Doc. #43-2 at ¶ 4; Doc. #43-1 at Ex. 4.  According to Jaggers, "whether an error is due to a customer's entry mistake or otherwise, it is the responsibility of the Customer Service Representative who is responsible for the customer to identify any errors and to insure that the order is correct before production."  Doc. #43-2 at ¶ 5.  Due to the erroneous production, Defendant "had to sell [the pieces] at … a loss of $2,460." *Id.* at ¶ 4.

On August 12, 2011, Jaggers issued Plaintiff a "Verbal Discussion."  Doc. #43-1 at 20–21; Doc. #43-2 at ¶ 3.  The Verbal Discussion states that Plaintiff "was counseled … concerning some of the reasons listed below.  This conference serves as a corrective measure and as a warning that continued infractions may lead to termination."  Doc. #43-1 at Ex. 4.  As grounds

for discipline, the Verbal Discussion listed the missing shipment and the erroneous production of furniture. *Id.* During the counseling session, Plaintiff "tended to downplay [the errors] as trivial." Doc. #43-2 at ¶ 6. Jaggers explained that this response "was a key reason I issued her the Verbal Discussion." *Id.*

### b. September 20, 2011, Write-Up

On September 20, 2011, Jaggers issued Plaintiff a "Disciplinary Action Form" for "[e]rrors in entry and proofing." Doc. #43-1 at Ex. 5. Specifically, the Disciplinary Action Form listed four errors allegedly committed by Plaintiff: (1) failure to recognize an "incorrect matching configuration" in a customer order; (2) issuance of an invoice with incorrect pricing; (3) entry of a wrong design for a customer order; and (4) entry of an incorrect shipping location. *Id.*

### c. October 26, 2011, Write-Up

On October 26, 2011, Jaggers issued Plaintiff a second "Disciplinary Action Form" for "[e]rrors in entry and proofing." Doc. #43-1 at Ex. 7. The form listed three errors: two failures to "proof" and catch an error in an order; and an inconsistent entry of pricing for an order. *Id.* Jaggers explained that, as with the Verbal Discussion, "a key reason [she] issued [the second] Disciplinary Action form was [Plaintiff's] attitude that the errors were trivial." Doc. #43-2 at ¶ 8.

### d. April 30, 2012, Write-Up and Termination

In January 2012, Jaggers, at the request of Allred, put into place a procedure "so that we could be kept apprised of cover shortages."[4] Doc. #49-2 at 52. Under this procedure, customer

---

[4] Cover shortages are a "lack of fabric for a particular order." Doc. #49-1 at 38.

service representatives were required to "fill out a hard copy for … Allred for information regarding cover shortages." *Id*.

At an unspecified time in the spring of 2012, Jaggers went to the Customer Service Department to investigate "cover shortages at order entry." Doc. #49-2 at 52–53. Jaggers looked at the book intended to contain the hard copies of cover shortage documentation and discovered that Plaintiff and Ellen Mink, another customer service representative, "had not been using it." *Id*. at 53. Upon further investigation, Jaggers concluded that Plaintiff and Mink had "ignored the procedure that was put in place." *Id*. Jaggers also noted that while Hupper had not made any "recent" entries, she denied ignoring the procedure. *Id*. Additionally, Jaggers claimed that a recently hired representative, Carrie Milner,[5] was not required to follow the procedure because she was only responsible for part orders. Doc. #43-2 at ¶ 16. During her interaction with the Department representatives regarding the procedure, Jaggers was speaking in a "loud manner" to everyone, but was particularly "loud with" Mink. Doc. #49-1 at 50.

As explained more below, Mink received a write-up for the alleged departure from procedure. However, Jaggers explained that "it was not necessary ... to issue Disciplinary Action Forms to … Milner or … Hupper … because … Milner was only entering parts and not account orders at that time and because when I asked … Hupper about the procedure she denied ignoring the procedure and I found no orders where … Hupper had failed to follow the procedure." Doc. #43-2 at ¶ 16.

Plaintiff later explained that the procedure was that "if you received an order and it had a cover problem on it, then you listed it on a form and kept it on your desk, and then copies were made for [Jaggers] and the vice-president of sales." Doc. #49-1 at 37–38. Plaintiff testified that,

---

[5] The circumstances of Milner's hire are explained below.

while she complied with this procedure, following "a certain time[, t]here wasn't anything to log in." *Id.* at 38. Although Plaintiff felt that she complied with the procedure, she declined to discuss the issue when Jaggers inquired about the book. *Id.* at 38.

Also in the spring of 2012, Defendant received an order from J.C. Penney which had to be separated into two categories – closeouts and retail. Doc. #49-2 at 54. Jaggers contacted Brian Tackitt, an employee of Defendant, and was told that "he did not have everything he needed" from Plaintiff. *Id.* at 56. When Jaggers contacted Plaintiff to find out whether Plaintiff had sent Tackitt all the necessary information, Plaintiff stated that she had spoken with Tackitt and that "he already has what he needs" and that "he didn't need anything." *Id.* Jaggers then asked Plaintiff to provide her "a list of the purchase orders." *Id.* Jaggers explained that Plaintiff acted inappropriately because "she was not cooperative in telling me what I had asked for." *Id.* at 56–57. Plaintiff testified that, during this interaction, Jaggers' "mannerism was very rude" and that she "used a loud voice." Doc. #49-1 at 49. When asked to clarify how Jaggers was rude, Plaintiff explained that her mannerism was "upset." *Id.*

Plaintiff, for her part, called the incident "a misunderstanding" and testified that she gave Tackitt and Jaggers the information provided. Doc. #49-1 at 35. However, Plaintiff stated that she could not remember whether she had given Tackitt the information prior to Jaggers requesting the information again. *Id.* at 35–36. Plaintiff also testified that she complied with Jaggers' request by providing her the purchase order numbers. *Id.* at 36–37.

On April 30, 2012, Jaggers met with Plaintiff and Dick Bridges, then Defendant's Director of Human Resources. Doc. #43-2 at ¶ 9. The purpose of the meeting was to issue Plaintiff a "Written Disciplinary Action Form" and to terminate her employment. *Id.* The Written Disciplinary Action Form listed two allegations of misconduct. Doc. #43-1 at Ex. 9.

First, the form alleged that Plaintiff willfully disregarded company policy requiring her to notify Allred and Jaggers of product shortages.  *Id.*  Second, Jaggers claimed Plaintiff was not "cooperative" when Jaggers inquired about the information submitted to Tackitt and that, when Jaggers requested information, Plaintiff "put her head down."  *Id.*  The form included a notation that "[t]his Disciplinary Action write-up is a termination notice."  *Id.*

Jaggers explained that the decision to terminate Plaintiff was made by herself, Allred, and Wiygul and that the final decision was reviewed by Bridges.[6]  Doc. #43-2 at ¶ 11.  According to Jaggers, Plaintiff "was terminated [because] she had received a Verbal Discussion and three Disciplinary Action Forms in approximately eight months for mistakes that cost Bauhaus a total of $3,702, and had the potential to damage Bauhaus's reputation with important customers, and for her uncooperative and insubordinate attitude towards me when the matters were addressed with her."  *Id.* at ¶ 12.

Following Plaintiff's termination, Jaggers redistributed Plaintiff's sales territories to Ellen Mink,[7] Sabrina Hupper, and Carrie Milner.  Doc. #43-2 at ¶ 13.  Jaggers distributed the territories according to each representative's seniority.  *Id.*  Accordingly, Mink, who had the most seniority, received the most territories, while Milner, who had the least seniority, received

---

[6] Bridges explained: "I did not make the decision to terminate Plaintiff['s] employment and my approval was not needed. I verified that … Jaggers's supervisor, Britt Allred, had approved [the] termination and I reviewed [Plaintiff's] discipline history.  I found everything to be in order from a human resources standpoint."  Doc. #43-7 at ¶ 2.

[7] Plaintiff argues that this claim is contradicted by the deposition testimony of Mink and Milner.  Mink initially testified that she could not "remember if I took any of [Plaintiff's accounts] or not because we switch accounts all the time so that they're handled properly and we still do that."  Doc. #49-3 at 14.  In a subsequent affidavit, Mink "ver[ified] that upon the termination of [Plaintiff], I received responsibility for four sales territories for which [Plaintiff] had been responsible."  Doc. #43-8 at ¶ 7.  Milner, during her deposition, answered affirmatively the question, "Would it be a fair statement that between you and [Hupper, Plaintiff's] accounts were divided up."  Doc. #49-22 at 6.  Neither Milner's testimony that Plaintiff's territories were divided between herself and Hupper nor Mink's initial testimony that she could not remember whether she had received any territories from Plaintiff directly rebuts Mink's and Jaggers' testimony that Mink received some of Plaintiff's accounts following the termination.

the fewest. *Id.* More specifically, Mink received four of Plaintiff's sales territories. Doc. #43-8 at ¶ 7.

### 3. Jaggers' Treatment of Carrie Milner

On March 19, 2012, Defendant hired Carrie Milner as a customer service representative. Doc. #49-22 at 4–5. Milner was 42 years old at the time she was hired. *Id.* at 5. At the point of hire, Milner was responsible for entering parts orders but was not assigned any business accounts. *Id.*; Doc. #43-2 at ¶ 16. Milner testified that she received her first business accounts after Plaintiff's termination. Doc. #49-22 at 5. In this regard, Milner stated that Plaintiff's accounts were split between herself and Hupper. *Id.* at 6.

Milner further testified that, while Jaggers never yelled at her, "[s]he has gotten very stern." Doc. #49-22 at 9. In contrast, Milner observed Jaggers yell at Mink and Plaintiff once each. *Id.* at 6–8.

Milner testified that she makes an error "once every month or two," but that Jaggers never wrote her up for an error. Doc. #49-22 at 10. Jaggers did, however, write Milner up for excessive absenteeism. *Id.* at 11–12. Milner explained that when Jaggers "addressed performance issues/errors with me, I did not argue with her or downplay the issues/errors as trivial; rather, I tried to understand the nature of the issue/error and informed Ms. Jaggers that I would make efforts to avoid making similar mistakes in the future." Doc. #43-4 at ¶ 2.

### 4. Jaggers' Treatment of Ellen Mink

Mink started working with Defendant on or about 1995. Doc. #49-3 at 4. She is still employed with the company. *Id.*

On September 16, 2011, Jaggers issued Mink a "Verbal Disciplinary Action Form." Doc. #43-2 at Ex. 8. The form identified three "[e]rrors in entry and proofing:" (1) "[e]ntry,

cancellation and proofing" errors in a customer order; (2) failure to copy Jaggers on a cancellation e-mail; (3) provision of incorrect information to a customer account." *Id*. The document also identified two "attitude" grounds for discipline: (1) a "[n]eed to work on relationship with Cyndi at Boston Interiors;" and (2) "[i]ssues with following directions and requesting assistance when you do not understand." *Id*.

On April 30, 2012, Jaggers issued Mink a "Written Disciplinary Action Form" for three infractions: (1) disregard of procedure, arising from failure to abide by the cover shortage policy; (2) failure to respond adequately to a customer request; and (3) improperly sending an "incoming order daily recap in an e-mail without explanation of why." Doc. #43-2 at Ex. 7. The form noted that, with regard to the cover shortage policy, Mink stated "I know you thought this was worthwhile, but it was about as useful as tits on a bull." *Id*. The write-up also alleged that when Jaggers addressed the daily recap issue, Mink responded by asking, "Why are you acting like this, what is wrong with you, louder and louder [until Jaggers] hung up the phone." *Id*. Mink testified that she felt Jaggers' treatment of the e-mail was abusive or created a hostile work environment. Doc. #49-3 at 6.

Jaggers explained that she chose not to terminate Mink's "employment because [Mink] only had one other disciplinary action in the previous year, a Verbal Disciplinary Action Form she received on September 16, 2011." Doc. #43-2 at ¶ 15.

Dobbins observed that Mink was Jaggers' "go to person" and was "favored" by Jaggers. Doc. #49-15 at 9, 20. At some point, Mink "missed an extended period of time" for a medical problem and Jaggers took over her accounts. Doc. #49-5 at 13. During this time period, Jaggers made errors with regard to Mink's accounts. *Id*.

### 5. Jaggers' Treatment of Sabrina Hawkins Hupper

As mentioned above, Hupper started as a customer representative with Defendant on February 8, 2010. Doc. #49-5 at 5. When asked to recount times Jaggers had "yelled at … or been mean" to her, Hupper stated that once Jaggers refused to answer a question and that, on occasion, Jaggers had given Hupper "verbal warnings [if she] made an entry error or things of that nature." *Id.* at 12.

At her deposition, Hupper testified that she made entry errors "once every two weeks." Doc. #49-5 at 15. In a subsequent affidavit, Hupper clarified that she was "referring to parts entry errors that I would catch myself before any order, production, or shipping took place." Doc. #43-3 at ¶ 6.

In September 2012, Ernestine Tate, who was then sixty years old, was laid off from her position as Scheduler for Defendant.[8] Doc. #49-20 at 8, 10. Following Tate's layoff, Hupper took over the scheduling duties. *Id.* At the time of her termination, Tate had never been written up or disciplined. *Id.* at 11.

### 6. Plaintiff's Allegations of Disparate Treatment

During her deposition, Plaintiff testified that Jaggers used "different guidelines" with the younger and older employees. Doc. #49-1 at 40–41. To this end, Plaintiff identified three issues: (1) application of time off policies; (2) access to a pricing override screen; and (3) general treatment of the customer service representatives.

At an unspecified time, Mink, with Plaintiff present, asked Jaggers whether she could "make up" hours "missed during the week." Doc. #49-1 at 41. Jaggers said she could not. *Id.*

---

[8] Allred told Tate that her position "was no longer needed." Doc. #49-20 at 16. Jaggers was not involved in Tate's termination. Doc. #43-2 at ¶ 21.

In contrast, Plaintiff testified that Hupper and Milner were allowed to make up time "missed during the week for doctors' appointments or such." *Id*. at 42. However, Plaintiff did not know when this occurred, how many times it occurred, or whether Jaggers gave Milner or Hupper permission to make up the time. *Id*.

Plaintiff testified that Milner and Hupper were given access to certain pricing screens to which neither Plaintiff nor Mink had access. Doc. #49-1 at 43–44. Plaintiff explained that access to these screens was necessary "to override the pricing" on certain items. *Id*. at 45. According to Plaintiff, Jaggers handled the price overrides for Plaintiff and Mink. *Id*. at 45–46. After Plaintiff's termination, Mink received access to the override pricing information because she "needed to perform price overrides for a specific customer." Doc. #43-2 at ¶ 18; Doc. #43-8 at ¶ 5.

Jaggers confirmed that Hupper "was given access to override pricing information because she needed it to perform her duties, and she did so only under my supervision and with my approval." Doc. #43-2 at ¶ 18. However, Jaggers stated that neither Milner nor Plaintiff required the codes to perform their duties. *Id*.

On three or four Fridays, Jaggers would call Plaintiff into her office for a "closed door meeting." Doc. #49-1 at 51. During these meetings, Jaggers would tell Plaintiff of her "dislike of the week's work or things that had not been done." *Id*. at 52. Plaintiff does not dispute that Jaggers raised issues that actually occurred. *Id*. However, Plaintiff felt that the meetings were verbally abusive because Jaggers raised her voice when addressing the issues. *Id*. at 52–53. While Jaggers called Mink for these closed door meetings, Plaintiff could not recall whether Milner or Hupper was ever subjected to one. *Id*. at 50, 53.

Sheila Barton, who worked as a purchasing and receiving clerk with Defendant until 2012,[9] testified that Jaggers "dislike[d]" Plaintiff and treated Hupper and Milner better than she treated Plaintiff. Doc. #49-19 at 5, 7, 9–11. Barton also observed that Jaggers was "sometimes" rude to Mink, but noted that Mink "was the type of person that spoke her piece of mind. [Plaintiff] was the type of person [who] wasn't." *Id.* at 10–11.

## B. EEOC Charge and This Action

On July 11, 2012, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Doc. #1 at Ex. A. Plaintiff's charge alleged that, after Jaggers assumed control over the Department:

> she began to treat me and the other older employee under her in a disparaging fashion, giving us unjustified write-ups. She had no issues whatsoever with the two younger employees who worked under her, even though they did not have nearly the job knowledge as did myself and the other older employee. The only explanation I can give for the differing treatment that the two older workers were given is the fact that we had much superior job knowledge than the other workers in the office and, because of our age and experience, Jaggers apparently felt threatened. The two write-ups which Jaggers gave me within the last few months before my discharge were trivial and were not the type of matters for which one would normally be written up. The only logical reason for my discharge is my age.

*Id.*

The EEOC issued Plaintiff a Notice of Right to Sue on February 25, 2013. Doc. #1 at Ex. B. Plaintiff filed this action on May 15, 2013, alleging wrongful termination in violation of the ADEA. Doc. #1.

In June 2013, Jaggers gave up her role as manager of the Department. Doc. #49-2 at 5. She currently serves "solely [as] executive assistant to the president." *Id.*

---

[9] Barton was terminated as part of a reduction in force. Doc. #49-19 at 7. Jaggers was not involved in the decision to terminate Barton's employment. Doc. #43-2 at ¶ 22.

Defendant filed the instant motion for summary judgment on June 6, 2014. Doc. #43. Plaintiff responded in opposition on June 27, 2014, Doc. #49, and Defendant filed a timely reply, Doc. #50.

**III**
**<u>Analysis</u>**

The Age Discrimination in Employment Act ("ADEA") "prohibit[s] employers from discharging or otherwise discriminating against any individual because of his or her age." *Miller v. Raytheon Co.,* 716 F.3d 138, 144 (5th Cir. 2013). In the absence of direct evidence of discrimination, as is the case here, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to claims brought under the ADEA. *Id*.

> Under this framework, the employee carries the initial burden of establishing a prima facie case of age discrimination. If he succeeds, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for terminating employment. If the employer satisfies this burden, the burden shifts back to the employee to prove either that the employer's proffered reason was not true—but was instead a pretext for age discrimination—or that, even if the employer's reason is true, he was terminated because of his age.

*Id*. (internal citations omitted).

**A.  Prima Facie**

To establish a prima facie case of age discrimination arising from a wrongful discharge, "a plaintiff must show that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010). To make a prima facie case, "a plaintiff need only make a very minimal showing." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996). Defendant

contends that Plaintiff cannot establish the second or fourth prongs of her prima facie case. Doc. #44 at 9–15.

### 1. Qualification

Citing out-of-circuit authority, Defendant argues that "[i]t is widely recognized that an employee who is not performing at the level legitimately expected by the employer is not considered qualified for the position for purposes of establishing a prima facie case." Doc. #44 at 9. This argument has been considered and expressly rejected by the Fifth Circuit. *See Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1505–06 (5th Cir. 1988); *see also Berquist v. Washington Mut. Bank*, 500 F.3d 344, 350 (5th Cir. 2007). Under relevant authority:

> [A] plaintiff challenging his termination or demotion ... can ordinarily establish a prima facie case of age discrimination by showing that he continued to possess the necessary qualifications for his job at the time of the adverse action ....
>
> By this we mean that plaintiff had not suffered physical disability or loss of a necessary professional license or some other occurrence that rendered him unfit for the position for which he was hired.

*Berquist*, 500 F.3d at 350 (quoting *Bienkowski*, 851 F.2d at 1506 & n.3).

Here, there is no dispute that Plaintiff did not suffer a physical disability, loss of a necessary professional license, or a similar occurrence that rendered her unfit for the customer service position. Accordingly, the Court concludes that Plaintiff has satisfied the qualification element of her prima facie case.

### 2. Replaced by Someone Younger or Discharged Because of Age

Defendant argues that Plaintiff cannot show that she was replaced because "[c]ase law makes clear that an employee whose duties are assumed by others after termination cannot establish that she was replaced for purposes of the prima facie case." Doc. #44 at 11. Plaintiff responds that the court may infer she was replaced by the fact that "Milner … was hired less than

two months prior to Jaggers' terminating Harkness." Doc. #48 at 18. Plaintiff also contends that she may complete a prima facie case pursuant to the work-rule doctrine. *Id*. at 19.

### a. Work-Rule Doctrine

Where a plaintiff has been terminated for violation of a "work rule," she "may establish a prima facie case by showing either that [s]he did not violate the rule or that, if [s]he did[,] … employees [outside her protected class] who engaged in similar acts were not punished similarly." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (internal quotation marks omitted). In the event a plaintiff is terminated for multiple violations of a work rule, she may establish her prima facie case by creating a genuine issue of material fact as to whether she actually committed one of the violations. *See Wiseman v. New Breed Logistics, Inc*., __ F. Supp. 3d __, 2014 WL 7272646, at *7 (N.D. Miss. Dec. 18, 2014).

Courts in this circuit have split on whether a plaintiff may state a prima facie case merely by denying she violated a relevant work rule. *See Moore v. Miss. Dep't of Human Servs.*, 6 F. Supp. 3d 713, 716 (S.D. Miss. 2014) (recognizing split between *Thornton v. Univ. of Miss. Med. Ctr.*, No. 3:09-cv-023, 2011 WL 4373942, at *6 (S.D. Miss. Sep. 19, 2011) (affidavit insufficient), and *Coleman v. Miller Enters., LLC*, No. 2:10-cv-296, 2011 WL 4737580, at *2 (S.D. Miss. Oct. 6, 2011) (affidavit sufficient)). In recognition of this split, recent decisions have assumed without deciding that mere denials satisfy a plaintiff's prima facie burden. *Moore*, 6 F. Supp. 3d at 716; *see also Lacy v. Dallas Cowboys Football Club*, No. 3:11-cv-0300, 2012 WL 2795979, at *7 (N.D. Tex. July 10, 2012).

Upon consideration, the Court concludes that the lower threshold approach articulated by *Coleman* is more consistent with the Fifth Circuit's directive that "a plaintiff need only make a very minimal showing" to establish a prima facie case. *Nichols*, 81 F.3d at 41. Accordingly,

Plaintiff may state a prima facie case by denying that she violated one of the work-rules for which she was terminated.

According to Jaggers, Plaintiff was terminated for, among other things, being uncooperative with Jaggers with regard to providing information to Tackitt and failing to follow the cover shortage policy.[10]  Plaintiff has denied both of these accusations.  Accordingly, the Court concludes that she has established a prima facie case of age discrimination under the work-rule doctrine.[11]

### b. Replacement

Having found that Plaintiff can meet her prima facie case under the work-rule doctrine, it is unnecessary to determine whether she was "replaced" by a younger employee, as that term is used in the prima facie inquiry.  This is fortunate because the Fifth Circuit precedent on the issue is somewhat muddled.

In a series of unpublished decisions, the Fifth Circuit has "held that an employee has not been 'replaced' when his former duties are distributed among other co-workers."  *Griffin v. Kennard Indep. Sch. Dist.*, 567 Fed. App'x 293, 295 (5th Cir. 2014) (citing *Rexses v. Goodyear Tire & Rubber Co.*, 401 Fed. App'x 866, 868 (5th Cir. 2010), and *Dulin v. Dover Elevator Co.*, 139 F.3d 898, 1998 WL 127729, at *3 (5th Cir. 1998) (unpublished)).  In contrast, a separate unpublished Fifth Circuit opinion held that a plaintiff made a prima facie case of discrimination where the "record reflect[ed] that only [plaintiff's] specific position was eliminated and his

---

[10] Plaintiff concedes that she did not articulate to Jaggers that she felt she had complied with the cover shortage policy.  While the reasonableness of Jaggers' belief of a violation relates to the pretext inquiry, it has no bearing at the prima facie stage.  *See Coleman*, 2011 WL 4737580 at *2–3 (finding prima facie case made under work-rule doctrine, but granting summary judgment against employee because "question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive").

[11] At the very least, an issue of fact about the cover shortage and cooperation violations exists for purposes of the prima facie case.

duties were assumed by someone outside the protected class." *Howard v. United Parcel Serv., Inc.*, 447 Fed. App'x 626, 629 n.2 (5th Cir. 2011).

Relying on *Howard*, a district court in the Northern District of Texas assumed without deciding that a plaintiff could state a prima facie case of age discrimination where his duties were redistributed to younger co-workers. *See Kean v. Jack Henry & Assocs., Inc.*, No. 3:12-cv-1159, 2013 WL 2983504, at *6 (N.D. Tex. June 17, 2013). This Court will follow *Kean*'s lead and assume without deciding that Plaintiff, whose duties were indisputably distributed in part to younger co-workers, has established a prima facie case of age discrimination regarding replacement. *See generally Yates v. Rexton, Inc.*, 267 F.3d 793, 799–800 (8th Cir. 2001) (employee satisfied prima facie where she "presented evidence that Cutting was hired approximately six months before Yates was terminated with the idea that Cutting would assume all of Yates's duties in a little more than a year").

### B. Legitimate Nondiscriminatory Reason

Defendant argues that Plaintiff was "terminated because she had received a Verbal Discussion and three Disciplinary Action forms in less than a year for mistakes that cost Bauhaus money, and had the potential to damage Bahaus's reputation with important customers, and for her uncooperative and insubordinate attitude towards Ms. Jaggers." Doc. #44 at 15. Plaintiff does not dispute that this is a legitimate nondiscriminatory reason. Accordingly, the Court concludes that Defendant has satisfied its burden under the *McDonnell-Douglas* framework. *See Little v. Republic Refining Co.*, 924 F.2d 93, 96 (5th Cir. 1991) (poor job performance is legitimate nondiscriminatory reason).

### C. Pretext

"If the employer articulates a legitimate, non-discriminatory reason for the employment decision, the plaintiff must then be afforded an opportunity to rebut the employer's purported explanation, to show that the reason given is merely pretextual." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010). "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (internal quotation marks omitted).

In a wrongful termination case, "to establish disparate treatment a plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances, that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001) (internal quotation marks and punctuation omitted). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003).

Generally, where a decision is made by a group of people, a plaintiff must show that a majority of relevant decisionmakers acted with a discriminatory animus or that, under the cat's paw theory of liability, the animus of one decisionmaker may be imputed to the others. *See Russell v. Univ. of Texas of Permian Basin*, 234 Fed. App'x 195, 203 (5th Cir. 2007) ("The six-person search committee unanimously selected Dr. Richardson as their choice to fill the tenure-track position. Dr. Richardson was therefore the search committee's choice, and not the personal choice of Dr. Watson. Without any evidence that Dr. Watson influenced the committee, we cannot impute Dr. Watson's allegedly discriminatory animus to the committee's selection."); *see*

*also Conner v. Lafarge N. America, Inc.*, 343 Fed. App'x 537, 544 (11th Cir. 2009) (finding no pretext where only one-member of five person committee possessed animus).

In seeking to show pretext, Plaintiff does not argue that either Wiygul or Allred (the two decisionmakers other than Jaggers) acted with any discriminatory animus. Rather, invoking the cat's paw theory of liability, Plaintiff seeks to impute Jaggers' alleged animus to these two men. Doc. #48 at 23.

In addressing cat's paw under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), the United States Supreme Court recently held that "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable …." *Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1194 (2011). Recognizing that the *Staub* "[c]ourt construed the phrase 'motivating factor in the employer's action, which is in the texts of USERRA and Title VII [but] not … in the text of the ADEA," the Fifth Circuit has called into question *Staub's* application to ADEA cases. *Holliday v. Commonwealth Brands, Inc*., 483 Fed. App'x 917, 922 n.2 (5th Cir. 2012). Courts which have considered the question in more detail have held that cat's paw liability applies under *Staub*, but that ADEA claims "require[] more than what must ordinarily be proven under an analogous Title VII or USERRA action." *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 949–50 (10th Cir. 2011); *see also Marcus v. PQ Corp.*, 458 Fed. App'x 207, 212 (3d Cir. 2012) ("To have a viable claim … using a cat's paw theory, a plaintiff must surmount both the causation and vicarious liability hurdles. This will be more difficult in an ADEA case than in a case arising under USERRA or Title VII ….").

Where *Staub* has been applied to ADEA claims, courts have eschewed the reference to proximate cause and have required that a plaintiff prove that the supervisor's animus "was a 'but-for' cause of, or a determinative influence on, [the] ultimate decision." *Sims v. MVM, Inc*. 704 F.3d 1327, 1336–37 (11th Cir. 2013); *see also Simmons*, 647 F.3d at 949–50. In summarizing the difference between proximate cause and but-for standards, the Tenth Circuit explained:

> a supervisor's animus might be a "but-for" cause of termination where, for example, the biased supervisor falsely reports the employee violated the company's policies, which in turn leads to an investigation supported by the same supervisor and eventual termination. Or the biased supervisor may write a series of unfavorable periodic reviews which, when brought to the attention of the final decision-maker, serve as the basis for disciplinary action against the employee. But where a violation of company policy was reported through channels independent from the biased supervisor, or the undisputed evidence in the record supports the employer's assertion that it fired the employee for its own unbiased reasons that were sufficient in themselves to justify termination, the plaintiff's age may very well have been in play—and could even bear some direct relationship to the termination if, for instance, the biased supervisor participated in the investigation or recommended termination—but age was not a determinative cause of the employer's final decision.

*Simmons*, 647 F.3d at 950.

Applying the authority above to this case, the Court concludes that, to establish liability based on Jaggers' alleged animus, Plaintiff must show that: (1) Jaggers performed an act motivated by ageist animus; (2) the act was intended to cause Plaintiff an adverse employment action; and (3) the act was a "but for" cause, that is a determinative influence, on Plaintiff's termination.

### 1. Act Motivated by Animus

Plaintiff does not specify, but appears to assert, that the April 30, 2012, write-up and subsequent termination decision based on the write-up were motivated by Jaggers' alleged animus. *Id*.

"[T]he cat's paw theory requires … evidence that the biased [employee] actually harbored discriminatory animus against the victim of the subject employment action …." *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013). Generally, the animus inquiry follows the same standard as a pretext analysis. *See Thrash v. Miami Univ.*, 549 Fed. App'x 511, 522–23 (6th Cir. 2014), *cert. denied*, 135 S.Ct. 245 (2014) ("Even assuming that Dr. Thrash could show that Dr. Lalvani's actions were a proximate cause of the ultimate tenure decision, Dr. Thrash has failed to show that Dr. Lalvani's actions were pretextual."); *see generally Intiveros v. Asarco Inc.*, 83 F.3d 732, 734 (5th Cir. 1996) ("[I]n tandem with a prima facie case, the evidence allowing rejection of the employer's proffered reasons will often, perhaps usually, permit a finding of discrimination without additional evidence.") (internal quotation marks omitted). Jaggers claims the April 30, 2012, write-up was based on Plaintiff's insubordinate attitude and her failure to follow relevant procedures. Accordingly, Plaintiff must show that the write-up or termination decision was actually motivated by discriminatory animus.

In seeking to show pretext, Plaintiff argues that: (1) "[a] reasonable jury could conclude that [she] would not be able to perform a job for over forty-nine (49) years, for four different companies, at such a high level that she never received a disciplinary action, then, in less than a year, [become] completely incapable of doing the job;" (2) Defendant "recruited [her] to work at Bauhaus and by all reports, she was performing her job admirably for the first six years of her employment;" (3) "[s]everal persons testified that [she] was an excellent worker, well liked by her co-workers and customers;" (4) "[t]here were different guidelines for the older and younger employees;" (5) "[t]he younger employees were allowed to make up lost time, not [her];" (6) "[t]he younger employees were allowed code access, not [her];" (7) "[t]he younger employees were not yelled at and verbally abused, as were [she] and Mink;" (8) "[e]very person in inside

sales made mistakes;" (9) "Mink and [she] were written-up for mistakes, and [she] was fired. Milner and Hawkins made the same amount of mistakes, and have never been written-up for doing so;" (10) "[t]here is a distinct pattern that Jaggers uses to get rid of an employee;" (11) "[she] denies what Jaggers claims she did in the final/terminate write-up;" (12) "[t]he decision to terminate [her] was made by Jaggers;" (13) Defendant "falsely stated that after [she] was terminated, her accounts were split between Mink, Milner and Hawkins;" (14) "Jaggers was insecure with the older employees and she preferred the younger employees with inferior job knowledge and experience, who would constantly ask her for advice;" (15) "Jaggers' favorite was Hawkins, who was in her twenties, and needed her assistance for every matter." Doc. #48 at 22–23.

### a. Past Competence (Arguments 1 & 2)

In essence, Plaintiff's first two arguments ask this Court to conclude that, because Plaintiff had never been written up in the past, the legitimate nondiscriminatory reasons for her write-up (disregard for procedure and insubordinate attitude) are not credible. However, because "[d]ifferent supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important," "differences in the evaluation of … performance do not establish a genuine issue on pretext." *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002); *see also Mendoza v. El Paso Cnty.*, No. EP-11-CV-0221-KC, 2012 WL 1952278, at *10 (W.D. Tex. May 30, 2012) ("[P]retext is not established by virtue of the fact that an employee has received some favorable comments in some categories, or has, in the past, received some good evaluations.").

### b.  Opinions of Co-Workers (Argument 3)

Plaintiff also argues that pretext may be shown by the fact that various co-workers thought highly of her work and attitude.  This type of evidence cannot create a genuine issue of material fact as to pretext (or animus) "because the issue, for purposes of pretext analysis, is not whether [Plaintiff] was, in fact, a good [employee but r]ather … whether [Defendant] actually and reasonably believed" that specific errors and attitude problems warranted the write-up. *O'Brien v. Lucas Assocs. Pers., Inc.*, 127 Fed. App'x 702, 707–08 (5th Cir. 2005); *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (finding opinions of co-workers "close to irrelevant" to pretext analysis).

### c.  Preferred Treatment of Younger Employees (Arguments 4–9)

Plaintiff's next four arguments relate to perceived differences in treatment between younger and older employees in the Department.  While unclear, it appears Plaintiff seeks to show that Jaggers favored younger employees and that this favoritism creates a genuine issue of material fact as to pretext.  To this end, Plaintiff points to alleged differences in: (1) treatment of "lost time;" (2) access to price override codes; (3) whether employees were "yelled at" or "verbally abused;" and (4) when employees were written up.  As explained above, disparate treatment is only relevant to the pretext inquiry to the extent it arises in nearly identical circumstances.

As to the issue of lost time, Plaintiff has introduced testimony that, on one occasion, Mink asked Jaggers if she could make up lost time and Jaggers said no.  While Plaintiff testified that Milner and Hupper were allowed to make up lost time, she could not name a single instance where either employee was allowed to make up lost time.  Furthermore, Plaintiff could not even

say whether either Milner or Hupper asked Jaggers to make up lost time. Under these circumstances, the issue of lost time is of little to no value in showing pretext.

As to the access codes, Plaintiff testified that Hupper and Milner had access to the price override codes and that neither she nor Mink were given such access. Jaggers in turn testified that access to the codes was provided on an as needed basis and that Mink was provided access to the codes when needed. Mink confirmed, and Plaintiff does not dispute, that Mink was eventually provided access to the codes on at least one occasion. In contrast, Plaintiff could not identify when, or how often, Milner was granted access to the codes. To the contrary, Milner offered testimony that she did not gain access to the codes until after Plaintiff's termination. Under these circumstances, Plaintiff's argument that age discrimination may be inferred from Jaggers' grants of code access is rejected.

Finally, Plaintiff argues that pretext may be inferred by comparing Jaggers' "abuse" of Plaintiff and Mink to the treatment of Milner and Hupper. To this end, Plaintiff has introduced testimony that, on three or four occasions, Jaggers called Plaintiff into her office and aggressively listed Plaintiff's errors the previous week. Plaintiff testified that Mink was subjected to similar treatment but that she could not remember whether Hupper and Milner ever were. Plaintiff also claims that Jaggers was loud and abusive during the confrontation regarding the information provided to Tackitt and during the incident regarding the cover shortage book. Mink and Hupper each testified that Jaggers identified their mistakes and, on at least one occasion, acted unfairly to them. Milner, in turn, testified that Jaggers could be stern with her, but did not identify any circumstances she deemed abusive.

In sum, Plaintiff has introduced evidence that creates a genuine issue of material fact as to whether, on five or six occasions, Jaggers acted aggressively towards her. What Plaintiff has

not done, however, is introduce evidence that any of these incidents involved circumstances "nearly identical" to an instance in which a younger employee was treated better. In the absence of such evidence, the possible verbal abuse is of little value to the animosity inquiry. *See Jordan v. Olsten Corp.*, 25 Fed. App'x 45, 46–47 (2d Cir. 2001) (rejecting pretext argument based on allegation that supervisor "berated [plaintiff] on two occasions in front of other employees but never treated white employees in this fashion" where the evidence was "unsupported by any description of a similar instance in which [supervisor] failed to act against a white employee").

Similarly, while Plaintiff argues that she made the same number of mistakes as Milner and Hupper, she has failed to introduce a single instance where she was written up under nearly identical circumstances to a situation where either Milner or Hupper was not. Accordingly, Plaintiff may not show pretext through differences in the number of write ups.

### d. "Pattern" of Terminations (Argument 10)

Plaintiff argues that animus may be inferred by Jaggers' purported "pattern" of hiring a young new employee and then terminating an older employee. As evidence, Plaintiff cites to her own termination (which preceded Milner's hiring by approximately three weeks) and the termination of Dobbins (which preceded Hupper's hiring by approximately six weeks). In both cases, a younger employee was hired shortly before the termination of an older employee and then received some of the older employee's duties.

As an initial matter, Dobbins testified that she did not believe Jaggers' animosity towards her was based on age. Dobbins' testimony, however, does not preclude the Court from drawing an inference of discrimination. *DeAngelo v. DentalEZ, Inc.*, 738 F. Supp. 2d 572, 584 (E.D. Pa. 2010) (denying summary judgment despite fact "some … comparators testified that they did not believe [defendant] discriminated against them"). Nevertheless, without *any* evidence of

discrimination surrounding Dobbins' termination, the Court views the transaction standing alone of little evidentiary value as to the existence of animus. It does, however raise a plausible inference that Hupper was hired because Jaggers intended to terminate Dobbins' employment.

In view of the Hupper hire and subsequent Dobbins termination, a reasonable fact finder could conclude that Milner (who ended up taking some of Plaintiff's duties) was hired because Jaggers intended to fire Plaintiff, and that the April 30 write-up, which occurred after Milner was hired, was motivated by this same intention.

### e.  Denial of Conduct (Argument 11)

Plaintiff argues that animus may be inferred based on her denial of the conduct underlying the April 30 write-up.  In this regard, the "analysis of whether an alleged violation of an employer's policy is a pretext for discrimination does not turn on whether the employee in fact violated the policy, but rather whether the employer reasonably believed the employee violated the policy and acted based on that belief." *Chamblee v. Miss. Farm Bureau Federation*, 551 Fed. App'x 757, 760 (5th Cir. 2014) (citing *Waggoner v. City of Garland*, 987 F.2d 1160, 1165 (5th Cir. 1993)).  Thus, as a general rule, an employee's denial of wrongdoing does not create pretext because it does not impact whether the employer reasonably believed the wrongdoing occurred. *Strahan v. Waste Mgmt.*, 539 Fed. App'x 331, 332 (5th Cir. 2013) (citing *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 654 (5th Cir. 2004)).  However, "where the decision maker relies on [her] own personal knowledge of the work rule violation … mere evidence disputing the violation will be sufficient to establish pretext." *Smith v. Int'l Paper Co.*, 160 F. Supp. 2d 1335, 1346 (M.D. Ala. 2001).

As explained above, Plaintiff was written up for two infractions: (1) failure to cooperate with Jaggers in obtaining PO numbers; and (2) "disregard for procedure" as to the cover shortage

policy." As to the cover shortage, Plaintiff testified that she complied with her understanding of the procedure, but that she did not explain to Jaggers how she had so complied. To the contrary, Plaintiff refused to speak with Jaggers regarding the policy. Furthermore, Plaintiff has offered no testimony which calls into question the reasonableness of Jaggers' understanding that the policy required notations in the cover shortage book. Under these circumstances, the Court concludes that Plaintiff has failed to create a genuine issue of material fact as to whether Jaggers reasonably believed that Plaintiff had disregarded the cover shortage policy.

Plaintiff's write-up for the Tackitt incident was based on the allegation that, when Jaggers made a request for PO numbers, Plaintiff "[p]ut her head down and q]uestion[ed] why when request [sic] are made." Doc. #43-1 at Ex. 9. The write-up also alleged that when Jaggers "requested a list of the retail P.O.'s, [Plaintiff] responded that she had already talked to Brian Tackitt and he knew about it." *Id*. During her deposition in this action, Plaintiff denied being uncooperative and denied putting her head down. Doc. #49-1 at 35–36. While this denial may not be found credible at trial, it is sufficient at this pretrial stage to create a genuine issue of material fact as to pretext with regard to the write-up of the Tackitt incident. *Smith*, 160 F. Supp. 2d at 1346.

### f.   Jaggers' Involvement in the Termination (Argument 12)

Plaintiff seems to argue that Jaggers' involvement in the termination decision is somehow evidence of pretext. Such a finding depends on the existence of discriminatory animus. It is not evidence of animus itself.

### g. "False" Claim that Mink Took Over Some Duties (Argument 13).

Plaintiff argues that there is a genuine issue of material fact as to whether Mink took over some of Plaintiff's accounts following the termination. As explained above, there is no dispute as to this fact.

### h. Jaggers' Preferences (Arguments 14 and 15)

Finally, Plaintiff offers her own deposition testimony as proof that Jaggers preferred younger employees and that Hupper was Jaggers' favorite employee. This type of speculation is insufficient to create a genuine issue of material fact as to the existence of discriminatory animus. *See Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 258 (5th Cir. 2009) ("speculative inferences [are] insufficient to demonstrate the existence of a genuine issue of material fact").

### i. Summary

In sum, Plaintiff has offered evidence allowing the following reasonable inferences: (1) Jaggers intended to terminate Plaintiff prior to the Tackitt and cover shortage incidents; (2) Jaggers falsely accused Plaintiff of failing to cooperate in providing PO numbers to Tackitt; and (3) following Plaintiff's termination based on the Tackitt and shortage allegations, Jaggers redistributed Plaintiff's duties, in part, to two younger employees.[12] While it is a close call, the Court concludes that the record is sufficient to create a genuine issue of material fact as to whether the April 30, 2012, write-up was motivated by discriminatory animus. *See Awugah v. Key Bank Nat'l Ass'n*, No. 2:12–cv–97, 2013 WL 950694, at *4–5 (D. Me. Mar. 12, 2013) (denying summary judgment based on cat's paw liability where plaintiff "introduced no written

---

[12] While these inferences are sufficient to defeat summary judgment, Plaintiff still carries the burden of proof in establishing at trial the facts underlying such inferences.

or oral statements indicating a retaliatory animus" but introduced evidence that her supervisor lied in disciplinary proceeding).

### 2. Intent and Causation

It is undisputed that Jaggers used the April 30, 2012, write-up to justify Plaintiff's termination and that the write-up then formed the basis for the termination. Accordingly, the Court concludes that there is a genuine issue of material fact as to whether the write-up was intended to cause Plaintiff an adverse employment action, whether the write-up was a determinative influence on Defendant's decision to terminate Plaintiff, and, therefore, whether the cat's paw theory of liability applies. Thus, summary judgment will be denied.

### IV
### Conclusion

For the reasons above, Defendant's motion for summary judgment, Doc. #43, is **DENIED**.


SO ORDERED, this 6th day of February, 2015.

**/s/ Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**
